## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUCAS FUSSELL,<br><br>            Defendant. | Crim. Action No. 1:24CR345 |

## MEMORANDUM IN AID OF SENTENCING

Lucas Fussell, through undersigned counsel, respectfully requests that the Court impose no more than 60 months of incarceration, followed by supervised release, when sentencing him for his offenses of distributing child pornography. The suggested sentence is sufficient but no greater than necessary to achieve the goals of sentencing for the following reasons.

*First*, Mr. Fussell appreciates and is remorseful for the harm he perpetuated by consuming and sharing child abuse material. *Second*, despite having been exposed to neglect, parental substance abuse, poverty, and myriad forms of abuse during his developmental years, he excelled academically and enjoyed a successful career as a nurse. Not only that, he is admired by friends and former patients alike for his dedication to serving his community, most especially those who are marginalized and underserved. *Third*, a longer sentence would create an unwarranted disparity, considering both national and local trends in cases—like this one—that do not involve production or other more aggravated child pornography conduct. *Fourth*, the attached risk assessment report by Dr. Agee shows that Mr. Fussell presents a low risk for

recidivism for multiple reasons. In short, 60 months in prison, supervised release, and the requirements for sex offender registration will, together, reflect the serious nature of the offense and provide ample punishment and deterrence.

## I.   The Court may depart from the guidelines if it finds that the guidelines do not reflect the mandate of 18 U.S.C.§ 3553 (a).

The Supreme Court has held that sentencing courts may vary from the guidelines based on policy disagreements alone. *Kimbrough v. United States*, 552 U.S. 85 at 101-02 (2007). As discussed below, because the child pornography guidelines are not based on empirical data and national experience, the Court may find that the guidelines fail to "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 89.

Indeed, numerous courts have approved policy-based variances from § 2G2.2. *See United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("[T]he child pornography guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine guidelines discussed in *Kimbrough*."); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (finding district court did not abuse discretion by imposing a policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required to develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (noting district court may choose to

agree with Congress's policy decisions as long as it recognizes its authority not to, but the child pornography "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *see also United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject any Guideline on policy grounds," but defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] guidelines"); *United States v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (finding defendant's argument for a policy-based variance from § 2G2.2 was "quite forceful," but not an abuse of discretion because defendant did not raise issue before district court).

Ultimately, of course, the central mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2). This requirement is not just another factor for the Court to consider along with the others set forth in § 3553(a)—rather, it places an independent limit upon the sentence.

## II.    A 60-month sentence is sufficient given the history and characteristics of Mr. Fussell, and the circumstances of the offense.

### A. History and Characteristics of Mr. Fussell

Lucas Fussell's troubled childhood is fully explored in the PSR and in the attached report by Dr. Agee. Counsel will not repeat here what is laid out in detail in the reports; suffice it to say Mr. Fussell overcame extremely difficult childhood circumstances. Due to his innate intelligence and drive, he earned admission to the University of Virginia and later, Johns Hopkins University, and enjoyed a successful,

3

rewarding career as a registered nurse. Unfortunately, unresolved childhood abuse trauma contributed to conduct that ended Mr. Fussell's career and will result in a substantial period of incarceration and long-term sex offender supervision.

Lucas Fussell was born in 1982 in Marietta, Georgia. His parents divorced when he was two years old. After the divorce, Lucas's mother moved back in with her parents, who refused to assist in raising Lucas. Consequently, Lucas lived with his paternal grandparents for two years until he moved in with his father and his father's new wife. Lucas's father abused drugs and alcohol throughout most of Lucas's childhood. He recalls being around his father using drugs when he was as young as five and six years old. Lucas's first stepmother was mentally and physically abusive; she would lock him out of the family trailer for hours at a time for minor misbehavior. When Lucas was about seven years old, his father separated from his first stepmother and later married Christine Fussell (nee Russell). Christine provided Lucas more stability and did not abuse him; however, his father continued to abuse drugs and alcohol throughout Lucas's childhood.

     **i.** ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

### ii.    Lucas's father's drug addiction impacted him in untold ways throughout his upbringing.

Lucas's father battled drug addiction and depression throughout Lucas's childhood. For Lucas, the line between love and neglect was often blurred. When his father was sober, he was the ideal father: loving, attentive, and full of affection. He spent time with Lucas and proudly attended his school activities and awards ceremonies. But those moments were fleeting, replaced by long stretches where his father would retreat into his addiction, leaving Lucas to navigate his absence. His father's addiction wove itself into their father-son bond. Lucas recalls sitting on the couch with his father as he used drugs; Lucas's father would ask Lucas to hand him his marijuana pipe or a beer. To Lucas, these precious moments with his father were often tainted by apprehension and dread about his father's altered state.

When Lucas was 16 years old, his father attempted suicide by slitting his wrists in the bathtub. Lucas was the one who found his father, unconscious in the bathtub, covered in blood. He had the wherewithal to call 911, thus saving his father's life. He recalls coming home from the hospital alone and having to clean up the blood in the bathroom.

Shortly after the suicide attempt, his father left for one month for inpatient treatment. During this time, Lucas was on his own. He remembers being hopeful that his father would return fully healed, only to be devastated when his father relapsed

a few months after leaving treatment. Six years later, his father died of an overdose when Lucas was twenty-two years old.

### iii. Lucas was academically talented and loved learning; school and, later, service to others were a refuge for him.

Despite the trauma of his childhood, Lucas excelled in school. He learned to read at early age and spent his free time reading anything he could get his hands on. Growing up, school was a refuge from his chaotic and abusive home life. He impressed the teachers and received positive feedback from them. He graduated high school with honors and earned admission at the University of Virginia.

When Lucas was twelve years old, he did a project on Gandhi. Learning about Gandhi inspired him to pursue a life devoted to serving others. He acted upon this inspiration in college by working at the Charlottesville Clinic. A friend who met him through the Clinic wrote that Mr. Fussell is "kind, compassionate, and helpful."[1] While in nursing school at Johns Hopkins, he set up a nursing clinic in Baltimore. Also while at Hopkins, Lucas wrote a magazine article about his experience growing up poor and the importance of understanding the backgrounds of patients seeking medical care.[2] After earning his nursing degree, he joined a rural practice that serves mostly low-income patients. Mr. Fussell's patients and colleagues have noticed his dedication to his work. A fellow nurse practitioner wrote of Lucas:

> Lucas is an extremely talented and dedicated nurse practitioner and a kind and generous man. He would frequently be at work 3-4 hours after finishing with patients, working on charts, making or follow up on

---

[1] Letter of Anne Cressin.
[2] *See* Lucas Fussell, *Understanding the Impoverished*, JOHNS HOPKINS NURSING Aug. 10, 2010.

referrals, fighting with insurance companies to get studies or prescriptions authorized, and following up on lab results, imaging results, refiling prescriptions, etc. None of these after hours activities generated more income for him; they were things that needed to be done to take care of his patients. Lucas, additionally, would frequently be running behind seeing his patients because he was too kind to tell a patient that they had too many concerns to address at that visit. As a result, his patients were extremely dedicated to him, and would often transfer their family members to his patient panel as well —because they knew that he would care of them in a way that is sadly lacking in Primary Care today. [3]

Echoing the above sentiment, a former patient wrote in her letter to the Court that Mr. Fussell was so helpful as her primary care provider that she recommended him to her family members.[4] Several members of Mr. Fussell's community have written letters to the Court describing his character for kindness and compassion.

**B. The nature and circumstances of the offense.**

The nature and circumstances of the offense are fully laid out in the statement of offense and accompanying report by Dr. Agee. Mr. Fussell accepted responsibility by pleading guilty to both counts of the Indictment. Mr. Fussell first encountered child pornography during the pandemic when he, like millions around the world, was spending increased time online. He had just divorced his husband and was living alone. Going to work was extremely stressful; he treated scores of COVID patients in the early days of the pandemic before there was a vaccine and much was unknown about the virus. A few patients died in his care.

---

[3] Letter of Blaire Siefkan, N.P.
[4] Letter of Karen Morris.

7

Due to restrictions on social contacts, he was not able to see his friends outside of work. During this intense and lonely time, his online communications—sexual and otherwise—served as a release. While Mr. Fussell was initially shocked the first time someone sent him child abuse images, he continued to view the content out of a "morbid curiosity." Agee Report at 19. He went on to share images with other adults he was messaging. There is no evidence that Mr. Fussell ever attempted to solicit a minor online or in person. Importantly, he knows that consuming this content is wrong, and he knew that at the time. Indeed, Dr. Agee observed that Lucas "endorsed ongoing feelings of guilt related to his charges." Agee Report at 23. For example, during the course of the evaluation, Mr. Fussell stated, "CP is damaging to the people in it, the kids in it, and long-term." *Id*. at 23.

Mr. Fussell also acknowledged that he engaged in "fantasy" talk about fabricated patients in order to interest the person he was messaging. He was not referencing actual patients and there is no evidence that he ever engaged in inappropriate behavior with any patient. To the contrary, his employment records show that he had an impeccable employment record, consistently received positive reviews from supervisors and patients alike, and had been promoted to Clinical Director of the community health center site where he worked.

The government baselessly asserts that Mr. Fussell "lied" to Dr. Agee. To the contrary, he admitted that he consumed child pornography with "morbid curiosity." He admitted that he viewed it, talked about it, and saved it. The government pounces on his comment that some images "auto-downloaded." Gov. Memo at 10. His comment

about autosaving was not a denial, just an explanation that at times, as is this case with all online content, he would click on an image and multiple images would download. This is not to say that he was not receiving and consuming the material, just that he was not always aware of how many images he was downloading.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████.

According to Dr. Agee's report, Mr. Fussell does not present with a pedophilic disorder. The government contends that Dr. Agee's professional opinion is wrong based on a selection of salacious messages Mr. Fussell sent. Dr. Agee reviewed Mr. Fussell's messages, talked to him for hours, and reviewed the statement of offense and PSR before rendering her opinion. To be sure, Mr. Fussell—like many people— said things online that did not reflect the person he was in the real world. In the real world, Mr. Fussell had several serious romantic relationships and dozens of sexual

partners—all consenting adults. Based on his history and her review of the pertinent materials in this case, Dr. Agee concluded that Mr. Fussell's offenses "appear less linked to a sexual focus solely on children, and more linked to his desensitization to sexual behavior; he seemingly escaped to online activities and became desensitized to extreme and deviant sexual material, including child pornography." Agee Report at 29. Importantly, Mr. Fussell has several "protective factors" that he can harness to ensure that he never re-offends, including genuine remorse for the harm he has caused, a supportive network of friends and family who will support him upon release, and valuable skills and education to forge a new career even if not in the medical field.

## III.    The child pornography guidelines are an imperfect proxy for culpability.

Undersigned counsel has reviewed the presentence report with Mr. Fussell and he raises no objection to the calculation of the applicable guideline range as 151 to 188 months of incarceration.

However, in this case, the guidelines fail to recommend an appropriate punishment. In recent years, a growing consensus within the judicial and legal communities has begun to understand that the child pornography guideline, U.S.S.G. § 2G2.2, is significantly flawed. Like the crack-cocaine guideline, the child pornography guideline is based not on careful, empirical study by the Sentencing Commission, but rather on Congressional mandates.[5]

---

[5] *See generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines,* Defender Services Office    Training    Division    (January    1,    2009),    available    at

As detailed in greater length in the Stabenow Report, the most significant and draconian changes to the guideline occurred because of the PROTECT Act of 2003.[6] That legislation mandated certain new enhancements, such as an enhancement of up to 5 levels based on the number of images involved. In addition, to keep pace with the newly enacted five-year mandatory minimum for receipt and distribution cases, the base offense level for those offenses increased 5 levels from 17 to 22.[7]

Rather than reflect enhancements that distinguish among defendants and levels of conduct, the guideline now includes enhancements such as "use of a computer," "material involving a child under the age of 12 years," and "number of images" that apply in virtually all cases.[8] For this very reason, the Second Circuit reversed a within-guidelines sentence imposed in a child pornography case citing the "irrationality" of the guideline. *See United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010). The court further cautioned sentencing courts in child pornography cases to "bear[] in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188.

Furthermore, the Sentencing Commission itself has recognized that enhancements, which were meant to increase penalties for egregious cases, now apply

---

https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/child-porn-july-revision.pdf [hereinafter "Stabenow Report"].

[6] *Id.* at 19-26.

[7] *Id. See also United States v. Hanson*, 561 F.Supp.2d 1004, 1010 (E.D. Wis. 2008) (describing changes to U.S.S.G. § 2G2.2 effected by the PROTECT Act).

[8] *See id.*

in virtually every case. In 2012, a Commission report analyzed sentences imposed in non-production offenses, such as the receipt and distribution of child pornography offense.[9] Based on its findings, the Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes.[10] However, no changes to the guideline followed the Commission's report. In 2021, the Commission issued another report focusing on non-production offenses resolved in fiscal year 2019.[11] That report made the following key findings, which were consistent with the 2012 report's findings:

- Non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest of victims.[12]

- USSG 2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements— accounting for a combined 13 levels—cover conduct that has become so ubiquitous that they may now apply in the vast majority of cases sentenced under 2G2.2.[13]

- For example, the enhancement for images depicting sadistic or masochistic abuse of an infant or toddler was applied in 84% of cases and the enhancement for having 600 or more images applied in 77.2% of all cases.[14]

---

[9] *See* U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* at 123-24 (December 2012), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf [hereinafter "U.S.S.C. 2012 Report"].
[10] *See id.* at 213, 219, 326-331.
[11] *See* U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf [hereinafter "U.S.S.C. Report 2021"].
[12] *Id.* at 4.
[13] *Id.*
[14] *Id.*

Thus, the Commission found that sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders. The Commission went on to conclude that because enhancements initially designed to target more serious and culpable offenders apply in most cases, the average guideline minimum has increased since 2005.[15] Finally, the Commission found that "courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornographer offender."[16]

i.    **Mr. Fussell's case reflects the concerns raised by the Stabenow and Commission Reports**.

Mr. Fussell's case is emblematic of concerns raised in the Stabenow and Commission Reports. Specifically, his guideline range is increased by 4 levels for use of a computer and for the age of victim. These two enhancements applied in *95 percent* of non-production cases in fiscal year 2019.[17] Likewise, he receives an additional 5-level enhancement for more than 600 images, which, as the Commission found, is increasingly common due to the advancements in technology. Indeed, in fiscal year 2019, non-production child-pornography offenses involved a median number of 4,265 images.[18] Mr. Fussell receives another 4-level increase for having images of an infant/toddler under § 2G2.2(b)(4), but the Commission found that this enhancement

---

[15] *Id.* at 5.
[16] U.S.S.C. Report 2021 at 5.
[17] *Id.* at 4.
[18] *Id.* at 30.

13

applied in 84% of non-production cases.[19] Thus, these enhancements, originally intended to apply to cases with aggravating factors, now apply to the vast majority of non-production cases, including Mr. Fussell's. For these reasons, in this case, the Court should give little weight to the applicable guideline range, and greater weight to the other factors under 18 U.S.S.G. § 3553.

## IV. The Need to Avoid Unwarranted Disparities.

The Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing."[20]

In this case, a variance is necessary to avoid unwarranted disparities between Mr. Fussell and other defendants charged with similar distribution of child pornography offenses. In fiscal year 2019, only 30.0% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range. Indeed, the JSIN data confirms that 100% of defendants with Mr. Fussell's guideline range received a below guidelines sentence. PSR ¶ 111. Under the circumstances of this case, imposing a

---

[19] *Id* at 19.
[20] U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* at 113 (November 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf.

sentence within (or even close to) the guideline range would create an unwarranted disparity.

As noted above, the sentencing range recommended by the guidelines is 151 to 188 months, and Mr. Fussell asks the Court to impose a sentence of 60 months. A sentence of 60 months for defendants who engaged in similar conduct or more culpable conduct (such as attempting to meet up with a minor, which Mr. Fussell did not do) is not uncommon in this district.

For example, in *United States v. Brian Schwan*, 17-cr-00175 (CRC) (D.D.C. Jan. 29, 2018), where the appliable range was 151 to 188 months for distribution of child pornography, the court imposed a sentence of 60 months imprisonment, to be followed by 120 months of supervised release. The defendant in that case not only sent videos but also chatted with the agent about arranging sex with the agent's purported 9-year-old daughter. *Id. See also United States v. Brian Hess*, 17-cr-00002 (KBJ) (D.D.C. Sept. 7, 2017) (applicable range was 151 to 188 months and defendant sentenced to 60-month term of imprisonment); *United States v. Bayo Bakare*, 16-cr-00129 (TSC) (D.D.C. Nov. 9, 2016) (appliable range was 151 to 188 months and defendant sentenced to 60-month term of imprisonment; charges included arranging to meet undercover agent and his purported daughter for purposes of the defendant having sex with daughter); *United States v. Christopher Solorzano*, 1:19-cr-00282, (TJK) (Defendant sentenced to 60 months' imprisonment, followed by 60 months of supervised release for sending agent several images of child pornography, including nude pictures of his minor stepdaughter with whom he claimed to have engaged in

sexual activity, and discussed traveling to Washington, D.C. to engage in sex acts with the agent's purported 8-year-old child). These are just a few examples from among the numerous defendants charged with equally or more serious conduct who received the sentence requested here.

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offender, affords adequate deterrence, and protects the public. Under the circumstances of this case, the mandatory minimum term of 60 months is more than sufficient to serve these purposes, particularly in connection with the collateral effects of the sentence.

When determining an appropriate term of incarceration, the Court should consider the other consequences of the conviction imposed on Mr. Fussell. He has lost a career that he worked hard to build and that he loved. He knows he will never work in the medical field again. Additionally, he will be required to register as a sex offender, with the publication of the information about this case to the community. This sex offender designation will make finding employment and housing extremely difficult. As several courts have recognized, collateral consequences of a conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's

finding, in a case involving a conviction for possession of child pornography after *Gall*, that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of prosecution).

A 60-month term of incarceration will serve as a substantial deterrence and no greater term is necessary to serve this purpose. The empirical evidence demonstrates that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.[21]

---

[21] *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 CRIME & JUST. 1, 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 CRIMINOLOGY 357, 358, 382 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The 2021 Sentencing Commission Report demonstrates that offenders charged with non-production child pornography offenses, like Mr. Fussell, are far less likely to recidivate than offenders charged with other offenses. In the 2021 Report, the Commission found that non-production child pornography offenders had a recidivism rate of 27.6%.[22] By comparison, the Commission has found that offenders charged with firearm offenses have a 68% recidivism rate, drug traffickers have a 50% recidivism rate, and those charged with fraud have a 34% recidivism rate.[23] A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research. In the 2021 Report, the Sentencing Commission found that the percentage of child pornography offenders released from incarceration or placed on probation in 2015 that were rearrested for a sex offense within three years was a little as 4.3%.[24]

---

[22] U.S.S.C. Report 2021 at 7.

[23] *See* U.S. Sent'g Comm'n, *Recidivism and Federal Sentencing Policy*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf.

[24] U.S.S.C. Report 2021 at 7. *See also* Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 SEXUAL ABUSE: J. RES. & TREATMENT 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC PSYCHIATRY 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 SEXUAL ABUSE 201, 207-08 & tbl. III

Beyond the statistics that support that Mr. Fussell will not reoffend, he has numerous protective factors he can summon to ensure he never again engages in illegal online conduct. For one, he is motivated by his profound remorse, which he expressed not only to Dr. Agee but also to his loved ones. He does not want to cause harm to anyone, let alone any child, and he understands the harm that he caused simply by consuming the child abuse material. Second, because he is a man of great character, he has developed a close network of friends who know about this case and who have vowed to help him when he is ultimately released. Finally, he has the skills and education to find another career that he enjoys, even if it cannot be in the medical field.

## Conclusion

For the reasons herein and the record in this case, Mr. Fussell respectfully submits that a sentence of 60 months is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

---

(2005) (finding that only 1.3% of those who had committed child pornography offending recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 SEXUAL ABUSE 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court put it, "the empirical literature [] generally concludes that there is little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *United States v. Marshall*, 870 F. Supp. 2d 489, 492 (N.D. Ohio 2012), *aff'd*, 736 F.3d 492 (6th Cir. 2013).

1.                                      Respectfully submitted,

                                        A. J. Kramer
                                        Federal Public Defender


                                        _____/s/_____
                                        Elizabeth Mullin
                                        Assistant Federal Public Defender
                                        625 Indiana Ave NW, Suite 550
                                        Washington, D.C. 20004
                                        (202) 208-7500